IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-331-D

| | | |
|---|---|---|
| CITY OF FAYETTEVILLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SECURITY NATIONAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On June 1, 2018, the City of Fayetteville ("Fayetteville" or "plaintiff") filed a complaint in Cumberland County Superior Court against the Security National Insurance Company ("SNIC" or "defendant") for breach of contract [D.E. 1-1]. On July 5, 2018, SNIC removed the action to this court [D.E. 1]. On March 28, 2019, SNIC moved for summary judgment [D.E. 15] and filed a memorandum in support [D.E. 16], a statement of material facts [D.E. 17], and an appendix [D.E. 18]. On April 17, 2019, Fayetteville responded in opposition [D.E. 19–21]. On May 1, 2019, SNIC replied [D.E. 22–24]. As explained below, the court grants SNIC's motion for summary judgment.

I.

In August 2015, Fayetteville requested proposals for a construction project to remove accumulated sediment in and along a creek located in Fayetteville. See [D.E. 17] ¶ 2; [D.E. 20] ¶ 2. The project area was "a low-lying area with high moisture content within an active waterway." [D.E. 17] ¶ 3; see [D.E. 20] ¶ 3. On September 30, 2015, Fayetteville accepted a bid for the project from Michael Walker, d/b/a Impera Contracting ("Impera"), and entered into a contract with Impera. See [D.E. 17] ¶ 4; [D.E. 20] ¶ 4. The contract stated that Impera was responsible for any damages

to Fayetteville's property or for losses arising out of any injury to any person or damage resulting from Impera's negligence. See [D.E. 17] ¶ 5; [D.E. 20] ¶ 5. The contract also required Impera to maintain commercial general liability ("CGL") insurance with policy limits of $1,000,000 per occurrence and $2,000,000 in aggregate. See [D.E. 17] ¶ 6; [D.E. 20] ¶ 6.

SNIC issued Impera a CGL policy, effective from September 3, 2015, to September 3, 2016. See [D.E. 17] ¶ 1; [D.E. 20] ¶ 1. First, the policy defined various terms. The policy defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." [D.E. 17] ¶ 22; [D.E. 1-1] 54. The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [D.E. 17] ¶ 22; [D.E. 1-1] 53. Second, the policy excluded coverage for "property damage" to

(5) That particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [the insured's] behalf are performing operations, if the property damage arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because [the insured's work] was incorrectly performed on it.

[D.E. 17] ¶ 23 (quotation omitted); [D.E. 1-1] 43–44. Finally, the policy required Impera to notify SNIC "as soon as practicable of an 'occurrence' or any offense which may result in a claim." [D.E. 17] ¶ 24; [D.E. 1-1] 49. Should a plaintiff bring a claim against Impera, the policy required Impera to notify SNIC as soon as practicable and to send "immediately" to SNIC "copies of any demand, notices, summonses or legal papers received" and cooperate with SNIC in settling or investigating the lawsuit or claim. [D.E. 17] ¶ 24; [D.E. 1-1] 49–50.

In October 2015, Impera began to perform under the contract. The parties agree that, with a properly-sized trackhoe, Impera's employees could have operated the trackhoe from the creek bank

2

to remove sediment from the creek bed. See [D.E. 17] ¶ 7; [D.E. 20] ¶ 7. However, Impera used at least one undersized trackhoe. See [D.E. 17] ¶ 8; [D.E. 20] ¶ 8. On October 24, 2015, an Impera employee drove a trackhoe off the creek bank and into the creek bed, and the trackhoe got stuck. See [D.E. 17] ¶ 9; [D.E. 20] ¶ 9.[1] Rather than using a tow vehicle or similar equipment to extract the trackhoe, Impera's employees attempted "several self-help measures that only made matters significantly worse." [D.E. 17] ¶¶ 10–11; [D.E. 20] ¶¶ 10–11, 13b; [D.E. 23] ¶ 13b. For example, Impera's employees tried to use a smaller excavator to dig the trackhoe out of the creek bed, which caused the trackhoe to sink further into the creek bed, destabilized the creek bank, and endangered a buried sewer line. See [D.E. 17] ¶ 12; [D.E. 20] ¶ 12.[2]

When Fayetteville staff learned of the situation, they "issued an immediate stop work order." [D.E. 17] ¶ 13; [D.E. 20] ¶ 13. Fayetteville then undertook steps to extract the trackhoe and prevent damage to and failure of the sewer line. See [D.E. 20] ¶¶ 13e–13f; [D.E. 23] ¶¶ 13e–13f. Fayetteville temporarily rerouted the sewer line, something that Fayetteville argues was necessary. See [D.E. 17] ¶ 14; [D.E. 20] ¶ 14. Fayetteville then hired another company to extract the trackhoe from the creek bed, who did so successfully without damaging the sewer line. See [D.E. 17] ¶ 14; [D.E. 20] ¶ 14; [D.E. 23] ¶ 14a. Fayetteville incurred $110,094.58 in costs for temporarily bypassing the sewer line and extracting the trackhoe from the creek bed. See [D.E. 20] ¶ 15; [D.E. 21-7]

---

[1] The parties' statements of material facts state that this event occurred on or about October 24, 2016. See [D.E. 17] ¶ 9; [D.E. 20] ¶ 9.

[2] Fayetteville maintained a buried, 24-inch diameter sewer line "just above the creek bed where the trackhoe got stuck." [D.E. 20] ¶¶ 13a–13b; see [D.E. 20] ¶¶ 13a–13b. When the trackhoe got stuck, its body "was lodged within ten to fifteen feet of the sewer line" and its bucket was lodged "on top of the sewer line." [D.E. 20] ¶ 13b. Fayetteville notes that the soil surrounding the buried sewer line "provide[s] important protection and stability for the line." Id. ¶ 13d; see [D.E. 23] ¶ 13d. Any damage to the surrounding soil "can lead to a failure of the" sewer line. [D.E. 20] ¶ 13d.

29–33.[3] Fayetteville demanded that Impera repay it for these costs. See [D.E. 17] ¶ 16; [D.E. 20] ¶ 16.

To recover its costs, Fayetteville engaged personnel at the North Carolina League of Municipalities ("NCLM"). See [D.E. 20] ¶ 16a; [D.E. 23] ¶ 16a. NCLM assigned Charlotte Martin ("Martin"), a property and liability claims adjuster, to represent Fayetteville. See [D.E. 20] ¶ 16a; [D.E. 21-7] ¶¶ 1–2. On November 4, 2015, Martin notified Impera that she represented Fayetteville in its recovery claim, that she was investigating the claim, and that Impera may be liable for costs exceeding $100,000.00. See [D.E. 20] ¶ 16b; [D.E. 21-7] 6. Martin also told Impera to notify its insurance carrier. See [D.E. 20] ¶ 16c. At the time, Martin believed that AmTrust North America ("AmTrust") was Impera's liability carrier and sent copies of her letter to AmTrust adjusters. See id.; [D.E. 21-7] 6.[4] In February 2016, Martin concluded her investigation, determined that Impera was responsible for Fayetteville's damages, and asked Impera to pay Fayetteville's costs. See [D.E. 20] ¶ 16e. On August 23, 2016, AmTrust closed its file on the case. See id. ¶ 16f. On August 24, 2016, SNIC denied Fayetteville's claim on the grounds that Impera's insurance policy did not indemnify Impera for the costs that Fayetteville claimed. See id. ¶ 16g; [D.E. 21-7] 24.

Fayetteville retained counsel to pursue recovery from either Impera or SNIC, and counsel sent two demand letters to Impera. See [D.E. 20] ¶ 16h; [D.E. 23] ¶ 16h. After Fayetteville's counsel received no response, Fayetteville's counsel e-mailed Impera on February 8, 2017, and threatened litigation. See [D.E. 20] ¶ 16i; [D.E. 23] ¶ 16i. On February 27, 2017, SNIC again

---

[3] Fayetteville states that it cost $94,968.50 to extract the trackhoe and $12,308.74 to temporarily bypass the sewer line. See [D.E. 21-7] ¶ 7.

[4] Martin communicated with one of AmTrust's adjusters about the claim several times before August 24, 2016. See [D.E. 20] ¶ 16d.

4

denied the claim. See [D.E. 20] ¶ 16j; [D.E. 23] ¶ 16j. On May 12, 2017, Fayetteville filed a civil action against Impera in Cumberland County Superior Court. See [D.E. 17] ¶ 17. On October 2, 2017, the Cumberland County Superior Court entered a default judgment of $125,773.24 against Impera. See id. ¶ 20. Impera did not notify SNIC of this lawsuit, and SNIC only learned of the lawsuit after the default judgment. See id. ¶ 21; [D.E. 20] ¶ 21. Fayetteville seeks an order declaring that SNIC is obligated to satisfy this judgment under the insurance policy.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252.;

5

see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Subject-matter jurisdiction is based on diversity of citizenship, and the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id. at 369. If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Id. (quotation omitted).[5] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted). Moreover, in predicting how the highest court of a state would address an issue, a federal court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); Wade v. Danek, Inc., 182 F.3d 281, 286 (4th Cir. 1999).

III.

Fayetteville, as a third-party beneficiary, alleges that SNIC breached its insurance contract with Impera. An insurance policy is a contract, and the policy's provisions govern the rights and duties of the contracting parties. See Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C.

---

[5] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

6

293, 299, 524 S.E.2d 558, 563 (2000); C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., 326 N.C. 133, 142, 388 S.E.2d 557, 562 (1990); Fid. Bankers Life Ins. Co. v. Dortch, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986).

Under North Carolina law, a breach of contract claim has two elements: (1) the existence of a valid contract and (2) a breach of the terms of that contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); Cater v. Barker, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006); Poor v. Hill, 138 N.C. App. 19, 29, 530 S.E.2d 838, 845 (2000). "Non-performance of a valid contract is a breach thereof unless the person charged shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Cater, 172 N.C. App. at 447, 617 S.E.2d at 117 (quotation and alterations omitted); Blount-Midyette v. Aeroglide Corp., 254 N.C. 484, 488, 119 S.E.2d 225, 228 (1961); see Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 311 (E.D.N.C. 2019); Barbour v. Fid. Life Ass'n, 361 F. Supp. 3d 565, 572 (E.D.N.C. 2019); Abbington SPE, LLC v. U.S. Bank, Nat'l Assoc., 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished).

"[T]he terms of a contract are to be interpreted according to the expressed intent of the parties unless such intent is contrary to law." Offiss, Inc. v. First Union Nat'l Bank, 150 N.C. App. 356, 363, 562 S.E.2d 905, 910 (2002); see Lane v. Scarborough, 284 N.C. 407, 410–11, 200 S.E.2d 622, 624 (1973); Duke Power Co. v. Blue Ridge Elec. Membership Corp., 253 N.C. 596, 602, 117 S.E.2d 812, 816 (1961). The insured party initially "has the burden of bringing itself within the insuring language of the policy." Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 606, 630 S.E.2d 221, 229 (2006) (quotation omitted); see Cleveland Constr., Inc. v. Fireman's Fund Ins. Co., 819 F. Supp. 2d 477, 481 (W.D.N.C. 2011). If an insured party does so, "the burden then shifts to

the insurer to prove that a policy exclusion excepts the particular injury from coverage." Kubit v. MAG Mut. Ins. Co., 210 N.C. App. 273, 283, 708 S.E.2d 138, 147 (2011) (quotation omitted).

Interpreting a written insurance contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). When interpreting a written insurance policy, "the goal of construction is to arrive at the intent of the parties when the policy was issued." Gaston Cty., 351 N.C. at 299, 524 S.E.2d at 563 (quotation omitted); see Stewart Eng'g, Inc. v. Cont'l Cas. Co., No. 5:15-CV-377-D, 2018 WL 1403612, at *3–4 (E.D.N.C. Mar. 20, 2018) (unpublished), aff'd, 751 F. App'x 392 (4th Cir. 2018) (per curiam) (unpublished); Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co., 802 S.E.2d 173, 175 (N.C. Ct. App. 2017). Moreover, courts construe coverage provisions broadly and exclusionary provisions narrowly. See Plum Props., 802 S.E.2d at 175–76. Nonetheless, courts do not "rewrit[e] the contract or disregard[] the express language used." Dortch, 318 N.C. at 380, 348 S.E.2d at 796.

Even if the court assumes without deciding that Fayetteville can show that at least some claimed damages fall within the meaning of "property damage," SNIC argues that two policy exclusions apply. First, SNIC cites paragraph 2(j)(5), which states that the policy does not apply to "property damage" to "[t]hat particular part of real property on which [Impera] or any contractors or subcontractors working directly or indirectly on [Impera's] behalf are performing operations, if the 'property damage' arises out of these operations." [D.E. 1-1] 44. Second, SNIC cites paragraph 2(j)(6), which states that the policy does not apply to "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because '[Impera's] work' was incorrectly performed on it." Id.

8

Paragraph 2(j)(5) excludes coverage for property damage to the areas on which Impera operates based on Impera's operations. Paragraph 2(j)(6) excludes from coverage property damage related to "the quality of the insured's work," which is properly considered a "business risk." Barbee v. Hartford Mut. Ins. Co., 330 N.C. 100, 103, 408 S.E.2d 840, 842 (1991); Alliance Mut. Ins. Co. v. Dove, 214 N.C. App. 481, 484, 714 S.E.2d 782, 785 (2011); W. World Ins. Co. v. Carrington, 90 N.C. App. 520, 523, 369 S.E.2d 128, 130 (1988).

Impera, and not SNIC, had sole control over whether Impera's performance would damage Fayetteville's property. See Barbee, 330 N.C. at 103, 408 S.E.2d at 842; cf. ACUITY v. Burd & Smith Constr., Inc., 721 N.W.2d 33, 38 (N.D. 2006) (stating that "a CGL policy is not intended to insure business risks that are the normal, frequent, or predictable consequences of doing business and which businesses can control and manage"). Even viewing the evidence in the light most favorable to the Fayetteville, paragraphs 2(j)(5) and 2(j)(6) apply to exclude Fayetteville's claimed costs. As for paragraph 2(j)(5), the parties agree that Impera's operations would occur on both the creek bed and the creek bank. See [D.E. 17] ¶ 7; [D.E. 20] ¶ 7. Thus, at the time of the trackhoe incident, Impera was operating on both the creek bank and the creek bed, and any property damage occurred to real property on which Impera was operating as a result of Impera's sediment removal operations. As for paragraph 2(j)(6), the policy excluded any property damage based on the quality of Impera's work. Accordingly, both provisions exclude coverage for any costs arising from Impera's operations on the creek bed and creek bank, and the court grants SNIC's motion for summary judgment.

Alternatively, Impera failed to provide SNIC timely notice of Fayetteville's lawsuit, which bars Fayetteville's claims. In fact, Impera never provided notice of the lawsuit. See [D.E. 17] ¶ 21; [D.E. 20] ¶ 21. Impera's CGL policy required Impera to notify SNIC in writing "as soon as

9

practicable" of any claim or lawsuit brought against Impera. See [D.E. 17] ¶ 24; [D.E. 20] ¶ 24; [D.E. 1-1] 49–50.

Failure to comply with an insurance policy's notice provision can bar coverage under the policy. See, e.g., Great Am. Ins. Co. v. C. G. Tate Constr. Co., 303 N.C. 387, 399, 279 S.E.2d 769, 776 (1981) ("Great American I"); Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197–98 (4th Cir. 2005). To analyze the effect of such a notice provision, North Carolina courts apply a three-part test:

> [T]he trier of fact must first decide whether the notice was given as soon as practicable. If not, the trier of fact must decide whether the insured has shown that he acted in good faith, e.g., that he had no actual knowledge that a claim might be filed against him. If the good faith test is met the burden then shifts to the insurer to show that its ability to investigate and defend was materially prejudiced by the delay.

Great American I, 303 N.C. at 399, 279 S.E.2d at 776; see Metric/Kvaerner Fayetteville, 403 F.3d at 197–98; Great Am. Ins. Co. v. C. G. Tate Constr. Co., 315 N.C. 714, 719–20, 340 S.E.2d 743, 746–47 (1986) ("Great American II"); Foremost Ins. Co. of Grand Rapids v. Raines, 246 N.C. App. 361, 784 S.E.2d 236, 2016 WL 1009327, at *5 (2016) (unpublished table decision); Pulte Home Corp. v. Am. S. Ins. Co., 185 N.C. App. 162, 172, 647 S.E.2d 614, 621 (2007); Liberty Mut. Ins. Co. v. Pennington, 141 N.C. App. 495, 500, 541 S.E.2d 503, 507 (2000). Whether an insured acted in good-faith is a subjective, two-part inquiry: (1) whether the insured was aware of its possible fault and (2) whether the insured purposefully and knowingly failed to notify the insurer. See Great American II, 315 N.C. at 720, 340 S.E.2d at 747; Raines, 2016 WL 1009327, at *5.

Fayetteville argues that this framework does not apply to third-party claims against an insured and contends that Impera's failure to comply with the notice requirement cannot, as a matter of law, bar Fayetteville's third-party claim under the policy. However, the "language of the test suggests that it is to be applied in cases involving third-party claims against an insured." Digh v. Nationwide

10

Mut. Fire Ins. Co., 187 N.C. App. 725, 730, 654 S.E.2d 37, 41 (2007); cf. Great American II, 315 N.C. at 720, 340 S.E.2d at 747; Great American I, 303 N.C. at 399, 279 S.E.2d at 776. Moreover, an "injured party who obtains a judgment against the insured has no greater rights against the insurer than the insured." Selective Ins. Co. v. Mid-Carolina Insulation Co., 126 N.C. App. 217, 219, 484 S.E.2d 443, 445 (1997); see Davenport v. Travelers Indem. Co., 283 N.C. 234, 238, 195 S.E.2d 529, 532 (1973); Woodruff v. State Farm Mut. Auto. Ins. Co., 260 N.C. 723, 727, 133 S.E.2d 704, 707 (1963). Thus, the court rejects Fayetteville's argument and applies the Great American three-part test.

Impera never notified SNIC of Fayetteville's claim and suit. Assuming without deciding that Impera acted in good faith, SNIC did not know of Fayetteville's suit until October 13, 2017, eleven days after the Cumberland County Superior Court entered default judgment against Impera. See [D.E. 23] ¶¶ 20–21. Moreover, Impera's delay materially prejudiced SNIC's ability to investigate and defend. See, e.g., Royal Ins. Co. of Am. v. Cato Corp., 125 N.C. App. 544, 549, 481 S.E.2d 383, 386 (1997); S.C. Ins. Co. v. Hallmark Enters., Inc., 88 N.C. App. 642, 650, 364 S.E.2d 678, 682 (1988); Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 52 F. Supp. 2d 569, 577 (E.D.N.C. 1999). Indeed, Fayetteville concedes that Impera's failure to notify SNIC prejudiced SNIC on the issue of damages. See [D.E. 19] 14. Accordingly, Impera's failure to notify SNIC bars Fayetteville from recovering under Impera's CGL policy with SNIC, and the court grants SNIC's motion for summary judgment.

IV.

In sum, the court GRANTS SNIC's motion for summary judgment [D.E. 15]. SNIC may file a motion for costs in accordance with this court's local rules and the Federal Rules of Civil Procedure. The clerk shall close the case.

SO ORDERED. This 23 day of July 2019.

                                                        JAMES C. DEVER III
                                                        United States District Judge